## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CHRISTOPHER E. YOUNG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:13-CV-553-NJR-DGW |
| | ) | |
| JASON BRADLEY, BART LIND, SEAN | ) | |
| FURLOW, MICHAEL CLARK, and | ) | |
| VIPIN K. SHAH, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Now pending before the Court is the Motion for Summary Judgment filed by Defendant Dr. Vipin Shah (Doc. 118) and the Motion for Summary Judgment filed by Defendants Jason Bradley, Michael Clark, Sean Furlow, and Bart Lind (Doc. 119).

### INTRODUCTION

Plaintiff Christopher Young, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), brings this action pursuant to 42 U.S.C. §1983 alleging his constitutional rights were violated while he was incarcerated at Pinckneyville Correctional Center ("Pinckneyville"). More specifically, Plaintiff alleges correctional officers at Pinckneyville failed to protect him from inmate attacks, despite receiving adequate warning, and these officers, as well as medical personnel, failed to provide him with adequate medical care. Following the Court's initial screening of the complaint pursuant to 28 U.S.C. § 1915A, as well as motions for summary judgment on the issue of

exhaustion, Plaintiff is proceeding in this action on the following counts:

**Count 1:**     Eighth Amendment failure to protect claim against Defendants
Bradley, Lind, Furlow, and Clark; and

**Count 2:**     Eighth Amendment claim for deliberate indifference to a serious
medical need against Defendant Shah.

All defendants have filed motions for summary judgment (Docs. 118 and 119), to which
Plaintiff timely responded (Docs. 125 and 127).

### FACTUAL BACKGROUND

Plaintiff's claims in this matter arise from his incarceration at Pinckneyville from
approximately June 2010 to March 2012 (Plaintiff's Deposition, Doc. 118-2, pp. 14, 26).
During this time, Plaintiff was involved in a number of altercations with other inmates
(*see* Inmate Disciplinary Card, Doc. 118-3, p. 2). Such altercations form the basis of
Plaintiff's Eighth Amendment claim against Defendants Bradley, Lind, Furlow, and
Clark, as Plaintiff claims that he sought protective custody from these Defendants but
was denied, and, as a result, he suffered multiple attacks at the hands of other inmates
(*see* Doc. 1). In particular, according to Plaintiff's deposition testimony, upon his arrival
at Pinckneyville, Plaintiff was interviewed by Defendant Clark, an internal affairs officer
at the time, and he informed this Defendant that Plaintiff had "several enemies" at the
institution (Doc. 118-2, p. 7). Plaintiff requested protective custody because he felt that he
was in danger, and Defendant Camp indicated he would look into it (*Id.*). Plaintiff never
heard anything else from this Defendant about placement in protective custody at the
time (*Id.*). Plaintiff has neither proffered nor provided any evidence regarding who he

named as an enemy upon his arrival at Pinckneyville. Plaintiff testified, however, that none of the inmates who allegedly attacked him was an individual he mentioned when he requested protective custody (*Id.* at p. 8).

Plaintiff's first documented altercation with another inmate at Pinckneyville occurred on July 16, 2011 (Doc. 118-5, p. 1). Plaintiff was found guilty of fighting with inmate Irwin and sentenced to three months C grade, three months segregation, and one month loss of good conduct credit (Doc. 118-4, p. 4; Doc. 118-3, p. 2). There is no evidence indicating that this ticket was ever expunged (*see* Doc. 118-2, p. 16). Plaintiff's next altercation occurred on October 13, 2011, when Plaintiff asserts he was attacked by two inmates as he entered the dining hall (*Id.* at p. 10). Plaintiff was issued a disciplinary ticket for fighting inmate Williams, which indicated that Plaintiff was observed fighting with another inmate in dietary (Doc. 120-2, pp. 1-2). According to the Adjustment Committee Report, Plaintiff pleaded guilty to the offense and was sentenced to one month of C grade, one month of segregation, and a fifteen day reduction of good conduct credit (Doc. 127, p. 17; Doc. 118-3, p. 2). Plaintiff alleges he did not plead guilty to the offense (Doc. 118-2, pp. 10-11). Plaintiff testified that the individuals who allegedly attacked him on October 13, 2011, were not individuals he had declared as enemies (*Id.* at p. 10). In his complaint, Plaintiff alleges that he again requested protective custody from Defendants Lind, Furlow, and Bradley after being released from segregation after this incident, but to no avail, as he was sent back to general population where he had enemies (Doc. 1, pp. 9-10). On January 2, 2012, however, Defendant Furlow sent a request to add inmate Williams to Plaintiff's known enemies' list and asked that Plaintiff

be submitted for transfer due to keep separate from ("KSF") concerns (Doc. 127, p. 14).

On December 27, 2011, Plaintiff was involved in another incident when he attempted to commit suicide by hanging himself because of an impending transfer to a new cell house (Doc. 127, pp. 5-6; Doc. 118-2, p. 12). More specifically, on this date, Plaintiff was notified that he would be moving from housing unit R1 to housing unit R2 (Doc. 127, p. 6). Plaintiff protested, informing R1 staff that he could not move to R2 because of enemy concerns (*Id.*). Plaintiff instructed R1 staff to call internal affairs, in particular, Defendants Lind, Furlow, and Bradley, regarding his cell house transfer (Doc. 118-2, p. 12). Plaintiff claims that internal affairs told the R1 staff to put Plaintiff in his cell, lock the door, and wait for their call (*Id.* at 12, 13). Plaintiff became discouraged while waiting for their call so he attempted to commit suicide (*Id.* at p. 13). Plaintiff was placed on "crisis watch" after his purported suicide attempt (*Id.*). Plaintiff alleges he was interviewed by Defendants Furlow and Lind after he was released from crisis watch and again requested protective custody, but he was denied (Doc. 1, p. 11). On the date of Plaintiff's alleged suicide attempt, Defendant Furlow sent a request for Plaintiff to be submitted for a lateral transfer due to concerns with his enemies (Doc. 127, p. 13). In his request, Defendant Furlow indicated that Plaintiff "currently has two (2) KSF's at this facility. [Plaintiff] has also asked for Protective Custody, but he has inmates listed on his KSF list at Pontiac CC and Menard CC" (*Id.*). Defendant Furlow interviewed Plaintiff about the incident on December 30, 2011, and Plaintiff explained that he liked his cell and cellmate in R1 and was upset because he was going to be removed from his cell (Doc. 120-6). Plaintiff further explained that he had some enemies in R2, naming inmates

Gill, Gasper, and Rabelo (*Id.*). Plaintiff was ultimately issued a ticket for "Damage or Misuse of Property," "Giving False Information to an Employee" and "Disobeying a Direct Order" (Doc. 120-7, pp. 1,3). Plaintiff was found guilty of the charges and sentenced to one month C grade and one month segregation (*Id.* at p. 1). There is no evidence that this ticket was ever expunged.

Plaintiff was again involved in an altercation with another inmate, inmate Epps, on January 30, 2012 (Doc. 118-2, p. 11; Doc. 118-3, p. 2; Doc. 127, p. 10). On this date, Plaintiff testified that he went out to the yard, and inmate Epps stabbed him in the arm (Doc. 118-2, p. 11). Plaintiff was issued a disciplinary ticket for fighting (*see* Doc. 127, p. 10), refused to appear at his hearing, and was found guilty of the charge (Doc. 120-3, pp. 1-2). Plaintiff was sentenced to one month C grade and one month segregation (*Id.* at p. 1). There is no evidence that this ticket was ever expunged (*see* Doc. 118-2, p. 16). At his deposition, Plaintiff testified that at some point before this incident (he was unable to recall exactly when), he had asked Defendants Furlow, Bradley, and Lind to keep him away from inmate Epps (*Id.* at p. 12).

On February 4, 2012, Plaintiff was involved in an altercation with his then-cellmate, who Plaintiff alleges attacked him with a lunch tray (*Id.* at p. 4). While the attack was occurring, Plaintiff alleges a correctional officer attempted to place a dinner tray in his cell's chuckhole and, in fear of his cellmate using the dinner tray as another weapon, Plaintiff pushed it back out, injuring the correctional officer (*Id.*). Plaintiff was issued a disciplinary ticket for the events and was sentenced to six months C grade, six months segregation, and two months loss of good conduct credit (Doc. 118-3, p. 2).

Shortly after this incident, in March 2012, Plaintiff was transferred to Menard Correctional Center ("Menard") (Doc. 118-2, p. 26).

Plaintiff also claims that while he was incarcerated at Pinckneyville, Defendant Dr. Vipin Shah failed to adequately treat his various medical conditions, including migraines, as well as back pain and neck and arm stiffness and numbness, which were exacerbated by the attacks he endured (*see* Doc. 118-2, p. 17). More specifically, Plaintiff avers that Defendant Shah failed to adequately treat his pain, did not provide necessary medication, and failed to submit referrals to specialists and provide adequate follow-up care (*Id.* at p. 19). Despite making these general allegations, Plaintiff has not provided the Court with specific instances in which Defendant Shah failed to adequately treat his medical conditions. As such, the Court relies on the medical records submitted by Defendant Shah to better articulate the medical treatment Plaintiff received from this Defendant.

By way of background, Plaintiff was involved in a motor vehicle accident in 1998, and he broke his jaw and injured his neck and back (*Id.* at p. 34). Plaintiff underwent a back fusion surgery at the time that has caused chronic back discomfort (*Id.* at pp. 18, 20). Accordingly, during his incarceration in the IDOC since 2004, Plaintiff has complained of off-and-on back pain (*Id.* at p. 20). Before he was transferred to Pinckneyville, on February 8, 2008, Plaintiff received an x-ray of his back that indicated there were degenerative changes to Plaintiff's lumbar spine with mild to moderate hypertrophic spurring (Plaintiff's Medical Records, Doc. 118-55, p. 11). These degenerative changes were again noted in an x-ray taken on May 7, 2010 (*see id.* at p. 10). When Plaintiff was

transferred to Pinckneyville in June 2010, it was noted that Plaintiff had suffered a cervical spine injury in 1998, as well as a low bunk permit (Doc. 118-57, p. 1). Plaintiff was seen on at least four occasions for his complaints of back pain from June 2010, when he arrived at Pinckneyville, until April 2011, when Defendant Shah became employed as the Medical Director at Pinckneyville (*see* Doc. 118-55, pp. 2, 4; Doc. 118-40, pp. 4-5; Affidavit of Dr. Vipin Shah, Doc. 118-1, ¶ 2). In particular, shortly after his arrival, Plaintiff was seen by a physical therapist who examined his range of motion and movement in his legs and arms (Doc. 118-2, p. 21). The physical therapist advised Plaintiff to keep wearing his back brace (which was issued to Plaintiff before his arrival at Pinckneyville), to exercise as much as possible, and to continue taking his prescribed pain medication (*Id.*). Subsequently, on January 11, 2011, Plaintiff was examined by Dr. Shute, who noted that although Plaintiff was complaining of chronic back pain, he was able to ambulate well, and prior x-rays had indicated there were degenerative changes to his spine (Doc. 118-55, p. 2). Plaintiff advised Dr. Shute that he did not like Naproxen and, as such, Dr. Shute prescribed Indocin, an anti-inflammatory medication (*Id.*).

Plaintiff first saw Defendant Shah on April 4, 2011, before any alleged attacks at Pinckneyville (Doc. 118-39, p. 2; *see* Doc. 118-2, pp. 22-23). Plaintiff recalls complaining of back pain, which was noted by Defendant Shah, and numbness in his right arm (Doc. 118-39, p. 2; Doc. 118-2, p. 22). Defendant Shah examined Plaintiff, evaluating his range of motion and leg and arm movements (Doc. 118-2, p. 24). Defendant Shah noted that Plaintiff was not in acute distress and reported he was able to dress himself (Doc. 118-39, p. 2). Defendant Shah observed that Plaintiff was also able to jump on the exam table on

command (*Id.*). Based on his examination of Plaintiff, Defendant Shah determined that he needed to obtain Plaintiff's medical records from Rockford Hospital, where Plaintiff had his back surgery, and would follow-up with Plaintiff after the records were received and reviewed (Doc. 118-39, p. 2; Doc. 118-1, ¶ 12).

Plaintiff was next seen for complaints of his back pain by a nurse on July 6, 2011 (Doc. 118-35, p. 5). The nurse did not find that an MD referral was required, and she prescribed Plaintiff Acetaminophen for seven days for his pain (*Id.*). Plaintiff saw Defendant Shah for the second time on July 29, 2011, for his regular asthma examination (*Id.* at p. 3). There is no mention of any complaints of back or neck pain or migraines at this appointment (*see id.* at pp. 1, 3). Plaintiff's medical records indicate that he next complained of neck and arm pain and stiffness on August 1, 2011 (Doc. 118-34, p. 7). Upon examination, the nurse found that Plaintiff had limited range of motion in his neck and right arm and referred Plaintiff to a physician. The nurse also prescribed Acetaminophen for seven days, to be taken as needed for pain (*Id.*). Per the nurse's referral, Plaintiff saw Defendant Shah on August 3, 2011 (*Id.* at p. 4). Although Defendant Shah's notes are almost indiscernible, his affidavit indicates that Plaintiff complained of neck and arm stiffness (*see* Doc. 118-34, p. 4; *see also* Doc. 118-1, ¶ 15). Although Defendant noticed no obvious deformities or limitations, he ordered x-rays of Plaintiff's cervical spine in light of the new complaint regarding his neck (*id.*). The x-rays were taken on August 3, 2011, and Plaintiff saw Defendant Shah for a follow-up appointment on August 9, 2011 (Doc. 118-34, pp. 3-4). Plaintiff's x-ray indicated that Plaintiff had signs of a prior fusion surgery, degeneration, and possible spurring of the

spine (Doc. 118-34, p. 3; Doc. 118-1, ¶ 16). Based on the x-ray results, as well as his evaluation, Defendant Shah determined that Plaintiff was suffering from degeneration/arthritis of the spine (Doc. 118-1, ¶ 16). Plaintiff recalls this diagnosis, indicating that Defendant Shah told him that he believed the arthritis was causing the numbness, which Plaintiff believes is "ludicrous" (Doc. 118-2, p. 25). In any event, Defendant Shah advised Plaintiff that the best long-term solution would be exercise and muscle strengthening of the back and neck (Doc. 118-34, p. 3; Doc. 118-1, ¶ 16). Plaintiff was provided instruction and education regarding potential exercises he could perform to strengthen his neck and back muscles (Doc. 118-1, ¶ 16).

Plaintiff next complained to medical personnel about his neck and arm stiffness and numbness on August 24, 2011 (Doc. 118-34, p. 1). After an evaluation by the nurse, Plaintiff was referred to a physician and was subsequently seen by Defendant Shah again on August 26, 2011 (Doc. 118-33, p. 5). Defendant's examination of Plaintiff was normal, and he again informed Plaintiff that in his medical opinion his complaints would best be addressed by continuing strengthening exercises for the neck and spine (Doc. 118-1, ¶ 17). Plaintiff was advised to return if there was a change in his condition (*Id.*).

On September 22 and November 10, 2011, Plaintiff was seen by a nurse for complaints of pain and numbness in his neck, back, and arm. Plaintiff was examined on both occasions, and neither revealed any obvious discomfort or distress (Doc. 118-33, p. 4; Doc. 118-32, p. 1). At his appointment on September 22, 2011, Plaintiff was not referred to a physician for evaluation, and he refused to see a physician at his appointment on

November 10, 2011 (Doc. 118-33, p. 4; Doc. 118-32, pp. 1-2). On November 17, 2011, Plaintiff was seen by Defendant Shah for his chronic asthma (Doc. 118-31, p. 6). There is no indication in the medical records that Plaintiff complained about his neck, back, or arm pain during this examination (*see id.*). Plaintiff did not see Defendant Shah again for any medical purpose before he was transferred to Menard.

Plaintiff did receive care, however, from a nurse following the altercation on January 30, 2012 (Doc. 118-28, p. 5). The nurse noted that Plaintiff had a 1 ½ inch abrasion on his forearm (*Id.*). The injury was cleaned, skin strips were applied, and there were no signs of infection (*Id.*). On February 7, 2012, Plaintiff was seen by a nurse for a follow-up appointment, and it was noted that the abrasion was healing well, and there were again no signs of infection (Doc. 118-28, p. 3). Plaintiff was transferred from Pinckneyville to Menard on March 6, 2012 (Doc. 118-27, p. 5). While at Menard, a physician, Dr. Shepard, ordered another cervical spine x-ray on May 16, 2012, which indicated no malalignment, no loss of cervical vertebral body height, and straightening of the cervical spine (Doc. 118-15, p. 6).

### LEGAL STANDARD

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). *See also Ruffin Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005); *Black Agents & Brokers Agency, Inc. v. Near North Ins. Brokerage, Inc.*, 409 F.3d 833, 836 (7th Cir.2005). The moving party bears the burden of establishing that no material facts are in

genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970). *See also Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir.2004). A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. "[A] complete failure of proof concerning an essential element of a nonmoving party's case necessarily renders all other facts immaterial." *Id.* The Seventh Circuit has stated that summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir.2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)) (other citations omitted).

## DISCUSSION

I.   **Count One–Eighth Amendment failure to protect claim against Defendants Bradley, Lind, Furlow, and Clark**

Although the Constitution "does not mandate comfortable prisons," *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)), it does not permit inhuman ones. *Farmer*, 511 U.S. at 832. "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners." *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1 (1992)). Similarly, the Eighth Amendment imposes duties on prison officials, who must provide human conditions of confinement and must "take reasonable measures to guarantee the safety of inmates." *Id.* (quoting *Hudson v. Palmer*,

468 U.S. 517, 526-27 (1984)). In order to state a Section 1983 claim against prison officials for failure to protect, a plaintiff must establish: (1) that he was "incarcerated under conditions posing a substantial risk of serious harm," and (2) that the defendants acted with "deliberate indifference" to his health or safety. *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (quoting *Farmer*, 511 U.S. at 834)). In other words, Plaintiff must demonstrate that Defendants had "actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997) (quoting *McGill v. Duckworth*, 944 F.2d 344, 348 (7th Cir. 1991)).

### A. Defendant Michael Clark

Plaintiff's claim against Defendant Clark is based on the allegation that Plaintiff informed this Defendant that he had several enemies at Pinckneyville immediately after his arrival and sought protective custody, but to no avail. Plaintiff contends he was subjected to a number of assaults at the hands of other inmates before he was transferred to Menard. The Seventh Circuit Court of Appeals has held that a prison official's failure to provide protection only constitutes an Eighth Amendment violation if the official "effectively condones the attack by allowing it to happen." *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997). The evidence here, when viewed in a light most favorable to Plaintiff, is not sufficient to establish that Defendant had actual knowledge of any impending harm and failed to prevent it. Importantly, there is no evidence before the Court to indicate that any of the enemies Plaintiff complained about to this Defendant were actually involved in any of the assaults that took place. Indeed, the record is bereft

of any indication as to who Plaintiff identified as his enemies when he spoke with Defendant Clark. As such, even though Plaintiff has presented some evidence that Defendant Clark failed to place him in protective custody, this failure is not evidence of any deliberate indifference on the part of this Defendant, because there is no evidence tending to show that Defendant was aware of any impending harm. Plaintiff's request to be placed in protective custody simply could not be honored, as Pinckneyville does not have a protective custody unit; rather, Internal Affairs staff can submit the offender for a transfer to another facility if an offender requests protective custody (Affidavit of Sean Furlow, Doc. 120-8, ¶¶ 2-3). This type of request is only made if Internal Affairs is able to substantiate an inmate's claims that warrant a lateral transfer (Doc. 120-8, ¶ 5). Here, there is no evidence demonstrating that Plaintiff was able to substantiate his need for a lateral transfer due to his enemy concerns immediately upon his arrival at Pinckneyville. For these reasons, Defendant Clark is entitled to judgment as a matter of law.

### B.  Defendant Bart Lind

Plaintiff's claims against Defendant Lind also relate to this Defendant's failure to place him in protective custody on various occasions, leaving him exposed to a number of attacks. In particular, the evidence before the Court demonstrates that Plaintiff requested protective custody from this Defendant following his altercation with inmate Williams on October 13, 2011, following his placement on crisis watch after his alleged suicide attempt on December 27, 2011, and following his altercation with inmate Epps on January 30, 2012. Based on the evidence before the Court, it appears that the entirety of Plaintiff's claim against Defendant Lind is based on the allegation that he did not place

Plaintiff in protective custody following these incidents. Such evidence is markedly insufficient to establish a claim of failure to protect. Indeed, Plaintiff has not provided a scintilla of evidence demonstrating that this Defendant was notified of any threat of impending harm *prior* to any of the attacks and/or incidents; there is also no indication Defendant Lind was aware of the identities of any of the enemies Plaintiff had at Pinckneyville. Accordingly, Plaintiff has not demonstrated that Defendant Lind knew of, and disregarded, any risk, so as to incur culpability. *See Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997). Defendant Lind is therefore entitled to judgment as a matter of law.

### C. Defendant Sean Furlow

Similar to the allegations against Defendant Lind, Plaintiff's claim against Defendant Furlow is based on this Defendant's alleged failure to place Plaintiff in protective custody upon request following altercation with inmate Williams his October 13, 2011, following his placement on crisis watch after his alleged suicide attempt on December 27, 2011, and following his altercation with inmate Epps on January 30, 2012. The evidence indicates that this Defendant twice sent a request that Plaintiff be submitted for transfer due to enemy concerns, the first on December 27, 2011, and the second on January 2, 2012. Plaintiff again has not provided a scintilla of evidence demonstrating that this Defendant was notified of any threat of impending harm *prior* to any of the attacks and/or incidents; there is likewise no indication that this Defendant was aware of the identities of any of the enemies Plaintiff had at Pinckneyville prior to any attack and/or incident. Accordingly, Plaintiff has not demonstrated that Defendant Furlow knew of, and disregarded, any risk to Plaintiff, so as to incur culpability. *See*

*Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997). Moreover, Plaintiff has failed to demonstrate Defendant Lind acted with "deliberate indifference" to his safety, because this Defendant took actions to submit Plaintiff for a transfer due to Plaintiff's enemy concerns. For these reasons, Defendant Furlow is entitled to judgment as a matter of law.

### D. Defendant Jason Bradley

Plaintiff's claim against Defendant Bradley is also based on his alleged failure to place Plaintiff in protective custody following various attacks and/or incidents by other inmates. In particular, the evidence before the Court demonstrates that Plaintiff requested protective custody from this Defendant following his altercation with inmate Williams on October 13, 2011, following his placement on crisis watch after his alleged suicide attempt on December 27, 2011, and following his altercation with inmate Epps on January 30, 2012. Based on the evidence before the Court, it appears that the entirety of Plaintiff's claim against Defendant Bradley is based on the allegation that he did not place Plaintiff in protective custody following these incidents. Such evidence is markedly insufficient to establish a claim of failure to protect. Indeed, Plaintiff has not provided an ounce of evidence demonstrating that this Defendant was notified of any threat of impending harm *prior* to any of the attacks and/or incidents; there is like no indication Defendant Bradley was aware of the identities of any of the enemies Plaintiff had at Pinckneyville. Accordingly, Plaintiff has not demonstrated that Defendant Bradley knew of, and disregarded, any risk, so as to incur culpability. *See Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997). Defendant Bradley is therefore entitled to judgment as a matter of law.

The Court notes that with regard to Defendants Clark, Lind, Furlow, and Bradley, it need not consider the issue of qualified immunity because it has already concluded that the evidence, when viewed in a light most favorable to Plaintiff, does not establish a genuine issue of fact as to whether Defendants failed to protect Plaintiff, in violation of the Eighth Amendment.

## II.  Count Two–Eighth Amendment deliberate indifference claim against Defendant Shah

Plaintiff alleges that Defendant Shah was deliberately indifferent to his serious medical needs in that Defendant Shah failed to provide adequate treatment for his back pain and neck and arm stiffness/numbness that was exacerbated by the alleged inmate attacks, and he failed to adequately treat his migraines. Defendant Shah contends that he is entitled to summary judgment on Plaintiff's claim because (1) Plaintiff's migraines did not constitute a serious medical need; (2) he was not deliberately indifferent to any of Plaintiff's medical needs; and (3) he is immune from liability pursuant to the doctrine of qualified immunity.

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such a claim, Plaintiff must show first that his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted).

With regard to the first showing, the following circumstances could constitute a

serious medical need: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain," *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *see also Foelker v. Outagamie County*, 394 F.3d 510, 512-13 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

A prisoner must also show that prison officials acted with a sufficiently culpable state of mind, namely, deliberate indifference. "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'." *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even recklessness as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823, F.2d 1068, 1072 (7th Cir. 1987). Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. A plaintiff does not have to prove that his complaints were "literally ignored," but only that "the defendants' responses were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes,*

546 F.3d at 524 (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)).

While Defendant Shah admits that Plaintiff's back pain can potentially constitute a serious medical need, he argues that Plaintiff's complaints about migraines do not constitute a serious medical need because Plaintiff never sought treatment for them with Defendant while at Pinckneyville. The Court agrees with Defendant. There is no evidence before the Court that Plaintiff ever complained of, was treated for, or diagnosed with, migraines. As such, Plaintiff's alleged condition was not so obvious that a lay person could easily recognize the need for a doctor's attention. *See Foelker*, 394 F.3d at 512-13; *see also Moore v. Liszewski*, No. 1:07-cv-1173, 2009 WL 3156711, *4 (C.D. Ill. September 28, 2009), *overruled on other grounds by Moore v. Mahone*, 652 F.3d 722 (7th Cir. 2011) (The court explained that "[t]he district judge granted summary judgment for the medical personnel. That ruling was clearly correct, so we say no more about it."). Based on this finding, the Court only considers whether Defendant Shah was deliberately indifferent to Plaintiff's complains of back pain and neck and arm stiffness/numbness.

Plaintiff complains that Defendant Shah was deliberately indifferent to his complaints of back pain and neck and arm stiffness/numbness, in that he failed to prescribe sufficient pain medication, failed to provide for an examination by a specialist, failed to provide for additional testing, and failed to provide sufficient follow-up care. The evidence, when viewed in a light most favorable to Plaintiff, does not establish that Defendant acted with deliberate indifference in treating Plaintiff's complaints of back pain and neck and arm stiffness/numbness. Specifically, the evidence before the Court demonstrates that between April 2011, when Defendant Shah became Medical Director

at Pinckneyville, and March 2012, when Plaintiff was transferred to Menard, Defendant saw Plaintiff on four occasions to assess his back pain and neck and arm stiffness/numbness. During each of Defendant's examinations, Defendant found that Plaintiff was in no acute distress and had no obvious deformities or limitations. Defendant also procured and reviewed Plaintiff's medical records form the hospital where Plaintiff underwent his 1998 spinal fusion surgery and ordered an x-ray of Plaintiff's cervical spine, which indicated spinal degeneration/arthritis. Accordingly, based on Defendant's examinations of Plaintiff, Plaintiff's medical history, and the results of his cervical spine x-ray, Defendant diagnosed Plaintiff with arthritis and advised Plaintiff that the best long-term solution to his complaints would be exercise and muscle strengthening of the back and neck. Further, the Court notes that a review of Plaintiff's medical records indicates that he was regularly receiving prescriptions for pain relievers and would have been on those pain relievers during his appointments with Defendant Shah (*see* Docs. 118-40, p. 4; Doc. 118-35, p. 5; Doc. 118-34, p. 7; Doc. 118-34, p. 1; Doc. 118-32, p. 1).

While Plaintiff clearly disagrees with Defendant's course of treatment, it is well-established that "[a] prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment was "blatantly inappropriate." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Greeno*, 414 F.3d at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996))). Making such a showing is not easy as "[a] medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under

those circumstances.'" *Pyles*, 771 F.3d at 409 (quoting *Sain v Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (other quotation omitted)). In other words, federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment. *Pyles*, 771 F.3d at 409 (citations omitted).

There is no evidence that Defendant's prescribed course of treatment was "blatantly inappropriate." Rather, Defendant examined Plaintiff on four separate occasions in less than a one year period and determined, based on his assessment, as well as a review of previous medical records and x-rays, that exercise and muscle strengthening of the back and neck was the best long-term solution to Plaintiff's complaints. While Plaintiff contends that Defendant should have taken a different approach with his treatment regimen, including additional testing and referral to specialists, such contentions are based solely on Plaintiff's own opinions and not on any opinion of a medical professional. Indeed, upon Plaintiff's transfer to Menard from Pinckneyville, Plaintiff was examined by another physician who ordered an additional cervical spine x-ray and prescribed anti-inflammatory medication (Doc. 118-17, p. 2). This physician never ordered an MRI or recommended additional treatment. Accordingly, Defendant's treatment regimen was implicitly endorsed by the physician at Menard. *See Pyles*, 771 F.3d at 411. Furthermore, with respect to Plaintiff's particular contention that Defendant should have prescribed some form of additional testing, such as an MRI, to determine what was causing his arm numbness, the decision to forego

diagnostic testing is "a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107.

Finally, the Court disregards Plaintiff's contention that he was not seen by Defendant Shah for complaints of back pain and neck and arm stiffness/numbness from August 2011 until his transfer in March 2012 because Defendant Shah refused to see him. In particular, the Court notes that Plaintiff has not provided any evidence to support his assertion other than his own deposition testimony, which is wholly lacking in details. Specifically, when asked if Plaintiff submitted sick call request slips to Defendant Shah in October 2011 after his alleged attack Plaintiff stated "I'm pretty sure I did … I just have to get my notes" (Doc. 118-2, p. 29). But Plaintiff never submitted any additional evidence to support this assertion. Importantly, Plaintiff's medical records indicate that Plaintiff refused to see a physician on September 26, 2011, and November 10, 2011, and refused nurse sick call on October 26, 2011 (Doc. 118-33, p. 1; Doc. 118-32, pp. 1,3,7). For these reasons, the Court finds that Defendant Shah is entitled to judgment as a matter of law on Plaintiff's claim of deliberate indifference. The Court need not consider the issue of qualified immunity because it has already concluded that the evidence, when viewed in a light most favorable to Plaintiff, does not establish a genuine issue of fact as to whether Defendant Shah acted with deliberate indifference to Plaintiff's serious medical need.

CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment filed by Defendant Dr. Vipin Shah (Doc. 118) and the Motion for Summary Judgment filed by Defendants Jason Bradley, Michael Clark, Sean Furlow, and Bart Lind (Doc. 119) are **GRANTED**. Plaintiff's claims against Defendants are **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff and to close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED:   January 28, 2016**

**NANCY J. ROSENSTENGEL**
**United States District Judge**